We'll hear from Mr. Freeland when you're, well, wait until Ms. Kwaja has a chance to walk out. All right. I guess we'll call your client Alita because Mitchell is the name of the decedent, right? And also, she's the widow of the decedent. I understand that, but the daughter is Ava Mitchell. Yes, ma'am. I'm, whatever. Alita. Just so we know the difference. Yes, ma'am. Yeah. Yes, ma'am. My name is Hale Freeland. I represent the appellates Alita and Craig. We are here today as a result of an interpleader action in which Alita was designated by her husband as the beneficiary of an annuity. As you know, this Court reviews summary judgment motions de novo, and, you know, typically appeals are not fact-driven because this is a summary judgment issue. This is a fact-driven argument, Your Honor. So, the issue, what's interesting is, in the cases that, where you challenge the designation of a beneficiary, the burden is on the person challenging that designation by clearing convincing evidence that the person who made that designation lacked the capacity to make that designation. And that issue was sidestepped and not even challenged. Instead, the Court imposed a burden upon the widow, saying that she must overcome the designation by, because she was a fiduciary, by clearing convincing evidence. Well, I thought it was an undue influence case. Yes, ma'am. Yes, ma'am. It's an undue influence case, but in order to get to that point, the wife has to be a fiduciary. Well, that this, if the Court affirmed the ruling and what the Court judge did, is going to set Mississippi case law on its head, because Mississippi recognizes that widows have certain, and widowers, have statutory rights to an estate. There's presumption if you must provide for a widow a child share, income, and a house. Well, I'm not going to tell you I know much about Mississippi law, but is my understanding correct that undue influence was alleged, and the person who's the beneficiary of property of the testator has, the test for that is, was the person in a confidential relationship, which your clients don't deny, and did the person have a hand in signing over the designations? And that's a presumption of undue influence, which I thought your clients were required to overcome. No, ma'am. Okay. The Mississippi, the cases that I've cited, Gina v. Harrington, says that just because you're a spouse doesn't mean you are in a fiduciary and undue influence, you're required to overcome that. The case of Gina v. Harrington, the spouse, there has to be a showing of some undue methods that the spouse did to control, and in the case of Gina, the instruction was offered on the part of the contestants, the person challenging that, that there was a confidential relationship of the marriage raising the presumption, and the Court rejected that, raising a presumption of undue influence, why we're here today. And the Court rejected that and said the binding authority in Mississippi, which addresses a relationship with a husband and wife, has consistently held that that presumption does not arise. And also, yes? The person accused of being the influencer here was Craig. That's right. And, Your Honor, that's based, this case comes from no good term goes unpunished. The decedent asked for assistance. Well, what the Court did is, because the widow has a different standard, there's no presumption that she's a fiduciary. Even with the power of attorney, there's no presumption. You have to add different factors to it. But the Court didn't even consider that issue. The Court said because they were daughter and son, the same presumption applies to the wife. And the Mississippi courts just don't hold that. He was a contingent beneficiary, right? At one point. He'd got... He wound up as contingent beneficiary? Yes, sir. Yes, sir. He did. He gets nothing. His mother survived, and he gets nothing. The Court seemed to hold that that was enough, though, the fact that he was a type of beneficiary. And so he was subject to that standard. Well, getting to that, Your Honor, he... The... As far as Mr. Craig is concerned, we even contend that there's enough disputed evidence, and we can go over each factor that shows that we have disputed evidence to deal with to challenge the undue influence. We have each of those. And what the judge did is he weighed all those facts. Well, I understand it is you just have to rebut the presumption. That's right. Right. And then what? Then what? Then does that go to a jury? Yes. Okay. And each one of these cases, there's never been a case in Mississippi in which a chancery court or a circuit court has granted summary judgments, and then each case is decided on appeal. And getting down to it, so what did the judge relied on? The judge relied on a hearsay affidavit that tried to skirt around the deposition testimony of the person challenging it. In her deposition, I asked her, do you know anything of undue influence? No. She wasn't in town. Do you know of any, his health was all right? Yes. She knew all those things, but yet in her affidavit, if you go through it, she tries to create some kind of conspiracy theory that, and we objected to it in our responsive brief. We don't even have to object. It's inadmissible testimony of somebody who's dead. It's hearsay. The court said nobody had objected on either side, if I recall correctly. Well, the court said that, but we objected, and we cited this in our brief, several places in our brief where we commented that this is hearsay affidavit that contradicts what her prior testimony was. Let me ask you, the court said that Craig had undue influence. Yeah. Yes, sir. You say that since Alita was not the influencer, an influence by him shouldn't count? Is that your... No. No, we can go, we can get into the application of the factors. The question is, what, if a court can subvert somebody's intent and what it takes to do that, right? So first, we're dealing with independent, disinterested persons. Well, the record shows that Mr. Lackland, who's the banker, Mr. testified that it was Don Mitchell's idea to make the change, that's in the record of 1349, that he was confident and understood and had no concern about what he was doing, that Don Mitchell led the meetings, that's in the record of 1350, that in addition, that it confirmed that three weeks prior, that he had found that money was being taken from his account. That's in the record of 1353 through 54. That shows some, he shut the account down afterwards. That's pretty good deliberation and knowledge. If you know somebody has an account somewhere else and is taking money out of your account and you shut it down, that shows some reasonableness and deliberation on his part. I have a question of, Craig was a financial advisor, is that right? No, he was, these people, Craig was the only college graduate and he was asked two or three times, hey, by Don, I need some help with finances, and he said he didn't want to do it. And then finally he agreed to do this. Now, people don't always go to lawyers to do and do the perfect thing, but the question is, did he have, did Mr. Mitchell have somebody that he consulted who understood, who could testify that he understood what he's doing? My question was, when they went to the bank, Don's concern was that Ava had been spending his money or taking money out of the bank and doing something with it. Why didn't they look at a couple of months' statements before that and see whether it was true or not? Well, they did found where she had taken several. They looked at the statements. They looked at statements. Ava was getting, Ava had controlled his accounts previously. Right. And he's a riverboat, dredge captain on a riverboat, pretty independent fellow, which his doctor testified he was. And he, when he was, he didn't get the statements, she did, and he didn't know what was going on in his account. That's my question. Why didn't they tell the bank, I want to see the last two months' statements? That's why they went, that's why they went to the bank. That's when they found out there were four different accounts, right? Yes, ma'am. But, I mean, it seemed like if they were concerned about money coming out of the account in that bank, all they had to do was tell the banker, let me see the statements from the previous two months. Well, they did, and he discussed that with the banker. And so the question is, what amounts were missing? You know, one way to solve this, of course, is for you guys to make a settlement, for everyone to settle. It's only money. Well, Your Honor. I don't mean to be crude, but better than pay the lawyers. Sure. But, I mean, this is not in the record, but when, when the, he wants, part of the reason he went to this bank, he was marrying this lady. And he wanted the natural heir, his wife, to receive it. And he says, I want them to receive it. And his children have been taking money for years. That's in the record. And on disability for years. And he was tired of it. He says, I want you to have this. Now, we're lawyers. Sure, that's easy. And it's part of, that's part of the settlement. But people's intent and what, carrying out their wishes at their desk, we can't, we can't, that's their value. So your rebuttal, your rebuttal of the presumption of undue influence by Craig is, is that Mr. Mitchell wanted to know the state of his affairs because he claimed that his daughter had kept it from him. And he wanted Craig to take him to the bank. And when they got to the bank, they found, he had reason to believe that the money had been misused and misspent. And he made a reasonable step in closing it down. Also, his doctor said he was independent and knew what he was doing. Also, the record is clear. He was within two months of death, of course. Of three. Three months. Three months. Well, there's a case that I've cited where somebody's on their deathbed. Some people don't think of that. But he did it when he was getting married. And it's his money, it's his entitlement to go, to who it goes through. And also, their Dr. Gentry, and then there's a person that every person who was there said he did what he wanted to do. No one on the other side, we don't even have to go there because it's their burden to change his intent by clear and convincing evidence. And they wanted to dodge the issue by saying, we're not going to challenge. Well, not if it's Craig, right? Not if it's Craig. Not if it's Craig. Craig had to rebut the inference. That's all. Craig had to rebut it. Right. That's right. I agree with that. That's just a burden of production. That's right. But we still have an issue of fact that the judge decided without a trial. Now, why did you send us this recent Mississippi Court of Appeals case? That case was because it was decided last week, and it was won, and it was on the same subject matter. And the person who received the benefit of the estate took and was present at the lawyer's office when the deeds were signed. Very factually similar, Your Honor. And they held that there was a rebuttal, and also there was a trial of that case. Trial. That's right. And so, Your Honor, and so I think that we've shown in the record good faith, independent, knowledge, and deliberation. There's no proof that this gentleman did but what he wanted to do. And I think we've shown that in the record, and I'll save my time for rebuttal. Thank you, sir. All right. We'll hear from Mr. Farrell. May it please the Court. My name is Mike Farrell. I'm from Jackson, Mississippi. Let me just cut to the chase here because I think the facts are pretty fairly streamlined, and my colleagues may differ with me, but why shouldn't this case go to trial? Because they didn't come forth with sufficient evidence to rebut the presumption. Well, how do you explain away the four different bank accounts? First of all, Your Honor, there was a bank account in Florida that was opened with the consent of Mr. Mitchell and also with the knowledge of Alita. She knew about that bank account. The other bank account in Alabama, which is in the record, there never was one. I don't know where that came from. It's not in the record. I think Mr. Mitchell was just confused or somebody was confused because there weren't accounts in that state. Did the banker testify to that? No, he did not. In fact, during his deposition, he pulled up the accounts. And he had had several in Arkansas for a number of years, and also there was a bank account opened up in Florida also with a Regents Bank, same banking system, and that was done to facilitate the purchase of groceries for Mr. Mitchell by his stepson. Just one or two other points. Mr. Freeland mentioned that, you know, he had had problems with his children taking money for a long time. That's not true with the children. He had had a problem with his stepchildren, who even as adults were dependent on him. They had had some legal problems, and he was very willing to pay legal fees and fines and whatnot. And he probably was tired of that after a while. But that argument does not apply to his biological children, that was Ava Tanner and Phyllis Fernandez. Ava was his grandchild, right? No, Ava was his daughter. His daughter. Yes, sir. And she had no children. But Don, through his second marriage, acquired stepchildren, who at the time were young, but they grew to be problems for him. Don had not known Craig for 40 years or something like that. He came as small as a little boy, and then when he and his father were friends. They were friends, and he didn't come into the picture for 45 years. Allegedly, I mean, they rely on this hearsay testimony that they quote and rely on. Supposedly, Don called him and said, help me with my bank records. And he said, no, I don't want to get involved. He did get involved on August the 7th. And we didn't object to this hearsay testimony. We said, Don, would you help me review my records? And at that point, Craig travels 80 miles from Jonesboro, Arkansas, to Heath, meets with him and Alita for three hours, and walks away with two boxes of financial records. What contact did Don and Craig have before that? None. This is a mighty fast friendship. Extremely fast, and a lot happened in six weeks. During those six weeks, Craig and Alita met with Don eight times in four different cities and signed nine financial documents. For each of those, Alita was always present, and Craig helicoptered in. He was always present when those nine financial documents were signed. And those are the suspicious circumstances. And if they were going to prove a rebuttal presumption with good faith, they should have had some explanation for why that happened. And they did not. For example, on that first trip to the bank, Don's purpose was, I want to go get my bank accounts. They said he was competent and able to handle his own affairs. Why would he have to call Craig to drive 80 miles to be with him when he asked the banker for his bank statements? So you're saying the district court is misstating the record when she says they went to Regions Bank on August 12th. While there, Don told Craig that his account had less than $18,000 when, in July, he had $58,000 in his money market account and $8,000 in the personal account. Don was advised he had active checking accounts in Alabama, Florida, and four in Arkansas. Don informed bank officials that he had no knowledge of accounts in Alabama and Florida and was only aware of three of the four accounts opened in Arkansas. The district court got it wrong? She didn't get it wrong, but she was quoting what Craig and Alita Mitchell testified to. That was the source. I think she was quoting them in making that finding. Well, it's at 73 to 75, whatever that is, Craig Cheatham's involvement in the finances. Docket 126. Okay. But that seemed to me to be part of the basis of why Craig was supposedly, you know, being asked to change accounts. Craig was just asked to be there when they got the accounts. Three or four days later, they go back to Regions, and that's when Don Mitchell goes in to see the banker and says, Okay, I want to do a few things. I'm going to marry this lady this afternoon. I want to put her name on my bank accounts, and I want to make her a beneficiary of this annuity. That's a stipulated fact. They're planning a wedding. How long have they planned that wedding? They've been talking about getting married for a long time, off and on. What do you mean planning a wedding? Ava, the family from Arkansas never knew about the wedding until after the fact. They weren't married. It was something done very quickly and very secretly. It was done in Alita's home, and sometime after the fact, Ava and her sister and other family members learned that they were married. But, well, Your Honor, the thing about the bank accounts, Craig Cheatham testified that the bank that Don said when they went on August 14th, I've only got $18,000 in this bank account, and just last month I had $66,000. Well, as Your Honor suggested, if he had gone back and looked at the bank account before, there was no $66,000, which suggests that Don was very confused about that. Plus, Craig Cheatham said there was $200,000 in a trust fund for Don's great stepchildren. He did put that provision in his trust. He never funded the trust. There never was $200,000, but he thought there was. And if Craig Cheatham is going to show good faith to show that there was some factual basis for Don's allegations, he would have gone back, simple matter, and looked at the bank account. What do you say about the doctor and the banker saying that Don appeared to be in control of his faculties? He probably was at that instant. When he went in and told the banker, I'm going to marry this lady, I'm going to put her on my bank account, that's another thing. Why doesn't that rebut the presumption sufficiently to go to trial? It's got to rebut the presumption on three separate issues, good faith, deliberation, and also independent consent and action. Well, let me take them one by one. When they went to the banker, Scottie Lackland, on August 14th, all they did was go in and say, Mr. Banker, I'm going to marry this lady, I want to change my accounts, and a beneficiary. That's all that banker knew. He knew nothing about deliberation. That goes to the credibility, not the substance of his testimony. If his testimony was he appeared rational to me. It goes, as the Supreme Court has said many times, undue influence is something that happens behind closed doors. And that's why you've got to look at the considered deliberation that went into the decision. Mr. Lackland, the banker, knew nothing about that. All he knew was he got a request, I want to change some people's accounts. What about his doctor? Oh, she said that he was oriented to time and space. Ava Mitchell testified that her father did not lack mental capacity. So in terms of those other independent witnesses, there was one who came to notarize a document. She was in his home, or Alita's home, I don't know, five, ten minutes, notarized a document and left. I mean, in a sense, I've never seen any of these parties to this, and all I can do is sort of rely on the credibility of each of you as the opposing counsel, and that makes me very nervous about deciding what was in this man's mind and whether undue influence was exerted under the circumstances. I don't think you need to look at what's in his mind, but if you look at all of the suspicious circumstances where there were these signings over eight. Look, there's no fool like an old fool, right? And everyone on the bench is as aware of that as perhaps you may be, although perhaps prematurely gray-haired. One other point I'd like to make, and that is whether Craig was a contingent beneficiary. Before that, when the Great American annuities were first changed, August 17th, Don made Alita the sole beneficiary of the whole thing, $258,000. He changed that. Two weeks later, August 30th, he makes Craig the sole beneficiary of $258,000. Now, just within the week before that, there were two other policies. He had a prudential policy, $186,000, made Alita the beneficiary, Craig contingent. A satiric investment account made Alita the beneficiary of $149,000. So she then has over $300,000, which could be why he changed Craig to be the sole beneficiary of $258,000. Now, about two weeks later. Was that at the request of the bank because they didn't think that the paperwork had been filled out correctly? That was an IRA account, and it's in the record. The bank sent a letter and said, as a part of these forms, you have made Alita a co-owner. You made Craig beneficiary, and Alita is a co-owner. And they said, this is an IRA account. She cannot be an owner. So they fixed that paperwork. That's what Gaelic requested them to do. Now, when they did that change, September 25th, that's when they changed the beneficiary back to Alita with Craig as contingent beneficiary. I would like to call your attention in our brief on the issue of whether, I mean, Alita wasn't entirely innocent, but she may have been passive. She was always present when any of these documents were signed. The case that we cited in our brief, the State of Johnson, involved a similar situation. A mother exerted undue influence, changed beneficiaries to herself and her daughter. That change was set aside. The argument was made, well, but the daughter is just totally innocent. Was that made on summary judgment or after trial? I don't know, Your Honor. I mean, that was significant to me about this Quinn case. These were findings after trial. In the Quinn case, that was one that they cited just the other day? Yes, yes, sir. Yeah, they needed some other facts to develop there. But in that case, there was no suspicious circumstances. The testimony was undisputed. The grandfather loved the grandson and said in a number of wills, I'm going to take care of you and remember you in my will. Now, the grandson then moves in and becomes a full-time caretaker. Shortly after that, they go to the lawyer's office, and the grandson is present when the will is signed. But they still went to trial. It was decided after trial. This would go to trial if they had any evidence with disinterested witnesses to prove those three factors, good faith, knowledge and deliberation, and independent consent and action. That's what they didn't have, and there's no need to go to trial. They didn't rebut the presumption. You know, something that overrides this that bothers me is, you know, it's very understandable to me that a man would make his new wife the beneficiary. Nothing irregular about that. I agree. In fact, we said in our brief, if he had just made his wife a beneficiary on one of these policies and had Craig not been around, you know, that may not raise any suspicion. It wouldn't have been any, as the Mississippi Supreme Court said, didn't involve any undue method. But here, where there is this rapid sequence of events where after Craig meets Don, within two or three days, he's got a power of attorney. He turns around, immediately faxes that to Satara and Great American and says, Ava's power of attorney is revoked, here's mine, don't do anything. The next day, they go see Regents Bank. Within the same week, they go to the trust attorney in Little Rock. Well, now, I mean, they do say that Craig had refused to talk to him about financial things previously. That's right. He said he didn't want to get involved. Right. And that was his position for a while. For several months. Several months. And, you know, it's... He said, we'll wait until he gets on his deathbed and then we'll do it all. That wouldn't be very smart, but who knows. Well, the fact that if he was exercising independent judgment, he wouldn't need Craig to always be there eight different times. And it wasn't easy for Craig to get there. He had to travel from Jonesboro, Arkansas, to either West Memphis or to Horn Lake, Mississippi. But he was... He worked for a manufacturing facility in Jonesboro. I forget the name of it. He had to take off from work. Take off work to make these long trips. I mean, you could infer that he wanted to be there to make sure that Don did what he wanted to be done for his mother's benefit and for his benefit. One other point I'd like to make. You know, they claim Ava was taking all this money. That they can't... Didn't prove any of that. But this... First of all, that the bank account was down $33,000 in August of 2015. Or that Don had ever funded a trust account. But as a result of the actions here, Ava's sister, the other daughter, Phyllis Fernandez, was also disinherited. There's no claim whatsoever that she did anything wrong or that Don had any ill will or motive to disinherit her. Well, again, I'm just going from the district court opinion, but it doesn't look as if she was in close contact with her father. She was in Florida. Ava had lived next door to her father for six or eight years as a caregiver. How long had Don been retired? Don, he worked until age 78 or 79. I believe 79. He just retired after he got diagnosed with the lung cancer. That's right. Retired then and then died two years later, two or three years later at age 81. So, obviously, in his day, he was a very robust person. Your Honor, we submit the due to their failure to rebut, first of all, to offer any evidence on the three factors under Mississippi law, and then not to rebut it with disinterested witnesses. The witnesses that they did present, I think, were disinterested. They had no stake in the outcome, but they were only present for a few minutes and were hardly in a position to show evidence of either good faith or that Don had deliberated on this decision or that they had any independent counsel. And under that third point, under Mississippi law, it used to require, you must show that Don had the advice of a person who was disconnected from the beneficiary and who was devoted solely to his interest. Of course, there was nobody close to that definition. Our Supreme Court now says that's still a factor, but you can consider all of the facts and circumstances. Even in this case, there's nobody that gave Don independent advice about whether he should change his beneficiaries. If this were to go to trial, would both sides strike the other's testimony? Don's testimony? Craig's testimony, Ava's testimony?  Alita's testimony? Would those all have to be struck because they're all interested witnesses? I think so. I don't think they could testify. So the only people who would testify would be the banker and the doctor? They may be able to testify about other facts, background facts, but in terms of showing their burden, their testimony would not be permitted. I'd like to see a jury follow that instruction. You know, they claim that Don's testimony is hearsay because he's now passed away, and both sides freely quoted him about what he had said. And I would just, it's in our brief, but I would suggest to the Court that his testimony is an exception to the hearsay rule under Rule 802.3, which refers to then existing mental, emotional, and physical condition. In fact, there is a Mississippi Supreme Court case that cited that rule in upholding the admissibility of testimony of a testator. But again, here, I don't think that's an issue because both sides relied on his testimony. Does that overcome the dead man statutes? Does Mississippi have a dead man rule? I should know the answer to that, but I don't. Well, I mean, this is dredged up from the longtime memory in Texas. You know, a dead man can't offer testimony of a dead person normally. There are a couple exceptions under hearsay, but, you know, like dying declaration and so on. But I never intended to make a will or something like that. You can't offer that substantively. I'd have to look that up. Well, maybe Mississippi doesn't have it. Well, thank you very much. Okay, Mr. Freeland. The main point being my client's not here. Nobody's here to testify, and I think the impressions that would be given would be totally different. Now, you asked for now, you know, people aren't geared to live alone, and Don had known Ms. Alita was a good friend of her husband. She'd been a widow for two years. He picks up the phone and calls her up. They were dating for two years. It was his idea at any age you can get married. It was his idea to get married. They've been talking. The record is clear. They've been talking about that for a while. And so the idea of some scheme or speculation is out of the air, and if this court wants to decide and affirm cases based on inference or conspiracies that's not in the record, well, that's a problem. What finally killed him? Did he get pneumonia or what? He died of he had had cancer and died. Well, I know that, but sometimes people ask. A heart attack. A heart attack. And here's the thing. Ava was left in March. His other daughter hadn't seen him in ten years. These people might. You were ten. Ten. Ten. They were text, if you want to see your father, this was in October, and then in November, you better see them. They didn't come. Ava went to take care of a dog in Texas instead of seeing her father. And, Your Honor, Ava's testimony, this is her deposition. I asked her does she have any evidence that Don acted but for his own free will. She says no. She wasn't present. That's in the record 1286 through 1287. She also testified in a text in November 20, 2015, that was within a month of his death, quote, I know he sounded very clear thinking when I spoke to him. I am thankful for that. That's in the record 1294. She was asked and said she was unaware of Don Mitchell losing his capacity to make decisions. She did not disagree with Dr. Gentry's assessment that her father was capable of making independent judgments in August 2015. Ms. Tanner testified that she had no information to contradict Dr. Gentry's opinion of her father's competency or of any undue influence. That's in the record of 1284 through 87. Yet this court and his independent thinking, she talked about this dredge captain having an idea of his own and not being controlled by anyone. And the only record evidence of this is his wife, who he asked to get married, sitting there passively. And one of the reasons she was there as Mr. Lackland testified, that she was he probably wanted her on the accounts. She had to sign the signature card. He made that request. Now, counsel opposite overstates a requirement that says there has to be some independent advice, whatever that may be. No, I thought it was independent consent and action. Well, the case of Mullins v. Ratcliffe, cited by the court, said that the independent advice prong in Murray has been read too strictly, considering the heavy burden placed on one seeking to overcome the presumption of undue influence. We find this unnecessary to redefine this prong of the Murray test. They said it's a factor. It's a factor. It's not dispositive, which he thinks it makes it dispositive, Your Honor. So as to Craig, Dr. Scottie Lackland, and the changes were made. Okay. If you've ever filled out those forms for IRAs or something, there can be kind of confusing. The backer filled them out wrong. So it was sent back until three times where they got it right, how he wanted it, to give to his wife. Ultimately, Your Honor, every case that the Mississippi courts, this is unusual. It's a diversity case on an estate. Am I suspicious that Craig was a contingent beneficiary rather than his daughter? Am I suspicious of that, Your Honor? He became a contingent beneficiary, and all I know is he was supposed to distribute his mother's assets according to her wishes, which he had promised to do. That's not in the record. I don't mean to be repetitive, but if he gave that money to Ava and Phyllis, maybe the whole thing would go away. Well, that's Mr. Mitchell's choice, Your Honor, and I'll end it at that. Yes, sir. Okay. Thank you for your time. Make it quick. One. I mean, phew. In several references to, you know, what if this went back for trial? I don't have it in front of me. I believe this is a non-jury case. So if it went back, it would go right back. Well, it said this case came from the chancellor, but you fellows are Mississippi lawyers, and I assumed you would know about that. But this particular case, it started as an interpleader case, and then Ava Tanner filed a cross-claim, but I don't believe anybody's requested a jury trial, which means it would go right back to Judge Brown. Well, and she'd have to look at the witnesses, look them in the eye, wouldn't she? Yes, Your Honor. Yes, sir. Okay. Thank you. All right. Thank you, gentlemen. We appreciate your appearance here today, and we'll be in recess until 9 o'clock tomorrow morning.